## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Feb 19 2015, 9:16 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

William Byer, Jr.
Byer & Byer
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ryan D. Johanningsmeier
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Malcom Cobb, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 19, 2015

Court of Appeals Cause No.
48A02-1404-CR-228

Appeal from the
Madison Circuit Court

The Honorable David A. Happe, Judge

48C04-1302-MR-249

**Kirsch, Judge.**

[1] Following a jury trial, Malcom Cobb, Jr. ("Cobb") appeals his convictions for murder,[1] a felony, and robbery[2] as a Class B felony. He raises three issues that we restate as:

> I. Whether the trial court committed reversible error when it excluded certain police officer testimony as being hearsay;
>
> II. Whether the trial court committed reversible error when it declined to give three of Cobb's proposed final jury instructions; and
>
> III. Whether the evidence was sufficient to convict Cobb.

[2] We affirm.

## Facts and Procedural History

[3] The facts most favorable to the verdict are that, in January 2013, Cobb was living with his parents in a duplex, located between Anderson and Lapel, Indiana. The victim in this case, Spencer Smith ("Smith"), resided next door, in the other half of the duplex. Cobb first met Smith in mid-2012, when Smith moved in. At that time, Cobb was forty-five years old; Smith was almost twenty-two years old. In the first weeks, they "shot the crap and carried on, had a few cocktails together." *Tr.* at 627. According to Cobb, their friendly relationship declined, and they saw each other mostly in passing at the duplex.

[4] On the evening of January 28, 2013, Cobb and his younger cousins, Joshua

---

[1] *See* Ind. Code § 35-42-1-1.

[2] *See* Ind. Code § 35-42-5-1. We note that, effective July 1, 2014, new versions of the murder and robbery statutes were enacted, but because Cobb committed his crimes in 2013, we will apply the applicable statutes in effect at that time.

Wood ("Joshua") and Jonathan Wood[3] ("Jonathan"), were "hanging out" in Cobb's garage, and Smith came by, "looking for some drugs." *Id*. at 323, 634. Cobb gave him a couple of "nerve pills" and sent him home. *Id*. at 634. Smith came back a couple more times and invited the men over to his home, and Cobb responded with "maybe later on." *Id*. at 636.

[5] Later that night, Cobb, Joshua, and Jonathan went over to Smith's residence. The group sat in the living room, "[c]hit-chattin' back and forth" and drinking vodka. *Id*. at 361. At some point, Cobb began accusing Smith of having raped a woman, based on comments that Smith had made to Cobb in the past. Smith denied the accusation, and Cobb held a knife to Smith's throat. Joshua heard Cobb threaten to kill Smith and saw Smith "crying and shaking" on the couch. *Id*. at 227.

[6] Joshua stepped outside and called the woman at the center of the argument and directly asked her if Smith had raped her, and she said he had not. Joshua came back into the living room with the phone and handed it to Cobb, so he could speak with her, at which time Cobb jammed the knife into the wooden table and took the phone. The woman told Cobb that Smith had not raped her. At some point after the phone call, Cobb went back and grabbed the knife and again put the knife to Smith's neck. Cobb then went to Joshua and held the knife to his throat, saying, "if you say anything, I'm gonna kill you and your whole family." *Id*. at 229-30, 328.

---

[3] Joshua and Jonathan are brothers.

[7] While Cobb had the knife at Joshua's throat, Smith got up and walked to his bedroom. Cobb released Joshua, who went outside, and Cobb followed Smith to the bedroom. From the hallway, Jonathan saw Cobb holding Smith down toward the floor next to an unopened black safe, and Cobb was pointing a handgun to his back. Joshua came back inside, and he too saw Cobb and Smith on the ground in front of the safe, and Cobb was yelling at Smith to hurry up and open it.

[8] When Smith did not open the safe quickly enough, Jonathan saw Cobb shoot Smith in the back of his shoulder. Smith turned around, and Cobb "just unloaded on him" with more shots. *Id*. at 334. Joshua, who was back outside at this point, heard at least two gunshots. He came inside and found Smith lying on the bed, back against a wall. At this point, it was around midnight, and Cobb called his former stepdaughter, Jennifer Kelley ("Kelley"), and asked her to call a cab and send it to his location. Cobb told Joshua and Jonathan to grab guns from Smith's apartment. When the taxi arrived, Joshua carried out a shotgun, wrapped in a coat, and Jonathan carried a silver handgun that belonged to Smith. Cobb put the safe into a box and carried it out, putting it in the trunk of the cab. The men went to Kelley's residence, bringing with them, two handguns, a shotgun, ammunition, knives, a safe, and some jewelry. When they were unable to open the safe, Kelley asked her neighbor to bring over a crowbar, and eventually Cobb and Jonathan opened the safe, which contained mostly empty pill bottles, coins, and trash. Kelley thought the men seemed "disappointed" and "frustrated" by the safe's contents. *Id*. at 396, 444,

462. Kelley and two of her friends who were also present at the apartment heard Cobb talking about having shot someone.

[9] While at Kelley's house, Cobb began discussing a self-defense strategy. He asked Jonathan to shoot him in the shoulder so that he could say that Smith did it, but Jonathan refused, and then Cobb cut his own clothing with a knife. At some point, Joshua contacted his parents, and they picked up the three men from a vacant lot in Anderson at about 2:15 a.m. Cobb told Timothy Wood ("Timothy"), father of Joshua and Jonathan, that he had killed a man and wanted to turn himself in at the Anderson police station, but Timothy stated that the duplex where the shooting occurred was out of Anderson's jurisdiction, so Timothy returned the three men to the scene, and Cobb called police from there. The men left behind at Kelley's house the shotgun, knives, and the safe, all of which Kelley hid in her residence, but police later recovered from her.

[10] When officers arrived at the scene, they encountered Cobb outside, on his cell phone, with Smith's black handgun, ammunition, and knife. Earlier, Timothy had taken from Jonathan's possession another handgun and ammunition, which Timothy gave to police approximately five hours after their arrival at the scene. Deputy Tim Basey of the Madison County Sheriff's Department found Smith deceased and lying on the bed, partially propped up against the wall. An autopsy revealed that Smith had been shot four times, suffering wounds to each shoulder, his chest, and his face.

[11] The State charged Cobb with murder and Class B felony robbery.[4] At Cobb's jury trial, the State called twenty-six witnesses, including various law enforcement officers, Joshua, Jonathan, the taxi driver, Kelley, and Timothy. Cobb testified in his case-in-chief, as did his parents.

[12] During trial, Deputy Basey testified that at 3:16 a.m. on January 29, 2013, he received and responded to a radio dispatch of a reported shooting. Upon arriving at the duplex, where Cobb and Smith resided, he secured the scene and entered the residence. He located Smith, who appeared lifeless, on the bed with his back against a wall.

[13] Officer Ryan Daniels of the Lapel Police Department ("LPD") testified that, on January 29, 2013, he responded to a dispatch call on a report of a shooting. When he and LPD Officer Jonathan Hosier arrived, they observed Cobb leaning on a pick-up truck, and also present at the scene were members of the Wood family, who he knew lived "a couple of units down" from the Cobb residence. *Tr.* at 120. After Officer Hosier handcuffed Cobb, Officer Daniels walked Cobb to the patrol car and placed him inside the vehicle. At trial, there was a line of questioning that occurred during direct examination, cross, re-direct, and re-cross of Officer Daniels, which inquired about what Cobb had said to Officer Daniels during the time that he was taking Cobb to the patrol car and as he was placing him in the car. On re-cross, Officer Daniels confirmed

---

[4] The State also charged Joshua and Jonathan with murder and robbery. They were transported from the Madison County Jail in order to testify at Cobb's trial.

that Cobb had provided "his version of events" to Officer Daniels, at which time Cobb's counsel inquired, "What did he tell you?" *Id*. at 125. The State then interposed a hearsay objection. Counsel for both parties presented argument to the trial court, out of the jury's presence. The trial court ultimately sustained the State's hearsay objection, finding that during re-direct examination the State was attempting to elicit a specific statement made by Cobb while getting into the vehicle, and that the State did not open the door to everything that was said by Cobb at the scene that night. *Id*. at 132. Cobb thereafter made an offer of proof and asked Officer Daniels some follow-up questions regarding what Cobb said "as he was getting in the vehicle," to which Officer Daniels responded that he could not recall. *Id*. 132-135, 138.

[14] Later in the trial, Cobb testified, providing the jury with his explanation of how events unfolded on the night in question. According to Cobb, Smith came over to Cobb's residence several times on the evening of January 28, 2013, asking Cobb for drugs. Cobb told Smith to go home each time, and Cobb eventually went over to Smith's residence to get him to "mellow out," so that Smith would stop bothering Cobb and his parents. *Id*. at 637. Cobb accused Smith of having raped a woman, based on comments that Smith made to Cobb on a prior occasion, and the two men argued. Cobb described that Smith swung a knife at him, but missed, and Cobb thereafter successfully took the knife from Smith's possession. Cobb followed Smith into his bedroom and encountered Smith coming from his closet with a gun. Cobb tried to get the gun from Smith, and a struggle ensued, during which the gun fired and hit Smith's shoulder. Cobb

testified that the struggle continued and that the gun fired two more times. At some point, Jonathan got possession of the gun, and when Cobb asked Jonathan to hand the gun back to him, Jonathan shot Smith in the face and then laughed. Cobb reported that Joshua and Jonathan wanted "souvenirs" and gathered up a handgun, two knives, and a shotgun. *Id*. at 651-52. Cobb testified that he picked up the safe and removed it from Smith's residence, placing it in the trunk of the taxi. Cobb denied that he asked Jonathan, or anyone, to shoot him in order to make it appear that he shot Smith in self-defense, as was reported in prior testimony, although Cobb conceded that he cut his own shirt while at Kelley's. Cobb said that, at Kelley's, he hit the safe with a hammer and eventually opened it, but "didn't care" what was in it and "didn't even look in it." *Id*. at 659-60.

[15] Following the presentation of evidence, the parties submitted proposed final jury instructions to the trial court. The State objected to Cobb's proposed final instructions ("Proposed Instructions") numbers 1, 2, and 3, all of which involved self-defense. The trial court determined that Proposed Instruction Nos. 1, 2, and 3 were not correct statements of the law and/or would be confusing and misleading to the jury and refused them.

[16] The jury returned a verdict of guilty on both of the charged offenses, murder and Class B felony robbery. The trial court conducted a subsequent sentencing hearing, and it sentenced Cobb to sixty-five years for murder and twenty years for the robbery conviction, ordering that the sentences be served consecutive to

each other as well as consecutive to another Madison Circuit Court cause number. Cobb now appeals. Additional facts will be supplied as necessary.

## Discussion and Decision

### I. Excluded Evidence

[17] Cobb asserts that the trial court committed reversible error when it sustained the State's hearsay objection during Officer Daniels's testimony about what Cobb had said to him at the scene. The decision to admit or exclude evidence is a matter within the sound discretion of the trial court. *Swann v. State*, 789 N.E.2d 1020, 1023 (Ind. Ct. App. 2003), *trans. denied*. An abuse of discretion occurs only if a trial court's ruling is clearly against the logic and effect of the facts and circumstances before it. *Id*. We afford the decision to exclude evidence great deference on appeal and reverse only when a manifest abuse of discretion denies the defendant a fair trial. *Id*. at 1023-24. We will not reverse a decision to admit or exclude evidence if that decision is sustainable on any ground. *Carpenter v. State*, 15 N.E.3d 1075, 1078 (Ind. Ct. App. 2014), *trans. denied*.

[18] On direct examination, Officer Daniels testified that Officer Hosier handcuffed Cobb and passed custody of Cobb to Officer Daniels, who walked with Cobb to the patrol car and placed him inside it. Thereafter, on cross-examination, Cobb's counsel asked Officer Daniels to confirm that he "took [Cobb] to the vehicle," and Officer Daniels responded in the affirmative. *Tr*. at 123. Cobb's counsel followed up with, "Did you have a conversation with him *during that time period*?" and the officer responded, "He did make a statement *during that*

*time period*." *Id*. at 124 (emphasis added). Cobb's inquiry about "that time period" thus referred to the period when Officer Daniels "took [Cobb] to the vehicle." *Id*. Next, during the State's re-direct examination of Officer Daniels, the prosecutor asked:

> Q: Officer, *when you were placing the defendant in your vehicle*, um, you said that the defendant made a statement at that time?
>
> A: That is correct.
>
> Q: What . . . what did he say to you?
>
> A: He reported to me that he was in his apartment where he resides and received a telephone call from [Smith].
>
> Q: [D]id the defendant say anything to you about needing assistance to get in the vehicle?
>
> A: I can not [sic] recall.

*Id*. at 124-25 (emphasis added).[5] Immediately thereafter, counsel for Cobb, now on re-cross, asked Officer Daniels,

> Q: Officer, did Mr. Cobb tell you the story of what happened that night?
>
> A: Yes, he did.
>
> Q: His version of what happened?
>
> A: Yes, he did.
>
> Q: What did he tell you?

*Id*. at 125. At this point, the State promptly objected on hearsay grounds.

---

[5] We note that during Cobb's testimony, later in trial, he stated that he required assistance when getting into the police car because of recent surgery on his leg. *Tr*. at 665.

[19]　Out of the jury's presence, counsel for both parties presented argument to the trial court. Cobb's counsel maintained that when Officer Daniels stated that Cobb had said he received a telephone call from Smith, the State thereby opened the door to additional testimony about what else Cobb had told officers, namely, his version of events. The prosecutor countered that the State had asked on re-direct examination only about what statement Cobb had made while being placed in the vehicle, and that did not open the door to testimony about other statements that Cobb may have made to officers that night while walking through the yard to the patrol car or while in the car. The trial court closed the record in order to listen and review the questions posed to Officer Daniels and his answers. Thereafter, the trial court determined that the State's question to Officer Daniels was directed to a very specific time frame, namely when Officer Daniels was placing Cobb in the vehicle, and Officer Daniels's response – about Cobb getting a call from Smith – was nonresponsive to that, as it went to statements made beyond that time frame. The trial court noted that it "would've been appropriate . . . for [the prosecutor] to make a nonresponsive objection and get the witness back on track to what was being asked[.]" *Id.* at 132. Ultimately, the trial court sustained the objection and ruled that the door had not been opened to Cobb's description of all the events of the evening coming into evidence at that point. *Id.*

[20]　Cobb thereafter made an offer of proof by asking Officer Daniels some follow-up questions regarding what Cobb said as Officer Daniels was walking him to the patrol car and as he was placing him in the vehicle. Officer Daniels stated

that Cobb began talking about the night's events during the minute or so that they were walking to the car. *Id.* 133-35. Cobb's counsel then asked, "But once you were placing him in the vehicle, he didn't give any other statements in regards to the events that occurred?" and Officer Daniels replied, "I can not [sic] recall whether he was or not." *Id.* at 135.

[21] We find that the trial court properly sustained the State's hearsay objection. First, we note that Cobb's offer of proof established only that Officer Daniels could not remember what Cobb was saying at the particular time when Cobb was being placed in the patrol car, and thus the offer of proof did not reveal any statements by Cobb that should have been admitted. *Id.* 132-35. Second, even assuming without deciding that the State opened the door to other statements made by Cobb before and/or after he was placed in the car, Cobb's question on re-cross that asked the officer "What did he tell you?" was an attempt to elicit his version of events as he told them to the arresting officer or officers at the scene. This testimony would have been hearsay because it was Cobb's out-of-court statement being offered by him as a prior consistent statement, not offered against him, and it was not subject to any hearsay exception. *See* Ind. Evid. Rule 801(d)(2) (to be non-hearsay, opposing party's out-of-court statement must be offered against that party). Furthermore, even if the trial court erred by sustaining the State's hearsay objection, any error in the exclusion of evidence is not grounds for reversal unless it is inconsistent with substantial justice and affects the substantial rights of the parties. Ind. Trial Rule 61; *Miles v. State*, 777 N.E.2d 767, 772 (Ind. Ct. App. 2002). Cobb argues that his statements to

Officer Daniels, if admitted, would have had "a substantial likelihood to contribute to Cobb not being convicted." *Reply Br*. at 3. Given the record before us, we disagree.

At trial, Cobb testified and related to the jury his version of the night's events, including his assertion that Smith swung a knife at him, and thereafter, Smith obtained a gun from his closet and the two struggled, resulting in the accidental gunshots to Smith. Thus, even though the trial court did not permit Officer Daniels to testify as to what Cobb had told him about how the shooting occurred, Cobb told the jury how it happened. Moreover, even if the desired testimony – Cobb's version of events as recited to Officer Daniels – had been permitted into evidence, there was substantial evidence to support Cobb's convictions. Joshua and Jonathan testified that Cobb held a knife to Smith's throat twice. Jonathan witnessed Cobb shoot Smith in the back of his shoulder as he hurried to open his safe and then "unload[]" more shots at Smith. *Tr*. at 334-35. Jonathan testified that Cobb shot Smith because he did not open the safe quickly enough. By all accounts, the men removed the guns, knives, and safe from Smith's residence and took the items to Kelley's residence. Cobb removed the safe and put it in the trunk of the taxi. Cobb and Jonathan opened the safe. Cobb called 911 from scene to report the shooting, and he was in possession of Smith's handgun at the time police arrived. We are satisfied that the exclusion of Cobb's statements to Officer Daniels did not affect the jury's verdict, and we find no reversible error with the trial court's evidentiary ruling. *See Johnson v. State*, 747 N.E.2d 623, 629 (Ind. Ct. App. 2001) (any error in

exclusion of defendant's proffered 911 tapes was harmless where there was substantial independent evidence to support convictions).

## II.   Instructions

[23]   Cobb claims that the trial court erred when, after conducting a hearing, it refused three of his proposed final jury instructions, all of which concerned self-defense.  Instructing the jury lies solely within the discretion of the trial court, and we review the trial court's refusal to give a tendered instruction for an abuse of that discretion.  *Schmid v. State,* 804 N.E.2d 174, 182 (Ind. Ct. App. 2004), *trans. denied; McCarthy v. State*, 751 N.E.2d 753, 755 (Ind. Ct. App. 2001), *trans. denied*.  Jury instructions are to be considered as a whole, and we will not find that the trial court abused its discretion unless we determine that the instructions taken as a whole misstate the law or otherwise mislead the jury. *Henderson v. State*, 795 N.E.2d 473, 477 (Ind. Ct. App. 2003), *trans. denied*. Instructional errors are harmless where a conviction is clearly sustained by the evidence, and the instruction would not likely have impacted the jury's verdict. *Randolph v. State*, 802 N.E.2d 1008, 1013 (Ind. Ct. App. 2004), *trans. denied.* That is, before a defendant is entitled to a reversal, he must affirmatively demonstrate that the instructional error prejudiced his substantial rights. *Schmid*, 804 N.E.2d at 182.

[24]   In determining whether the trial court properly refused a tendered instruction, we consider three factors:  (1) whether the tendered instruction correctly stated the law; (2) whether there was evidence in the record to support the giving of

the instruction; and (3) whether the substance of the tendered instruction was covered by other instructions. *Id.* Here, the trial court instructed the jury regarding self-defense as follows:

> It is an issue whether the defendant acted in self-defense. A person may use reasonable force against another person to protect himself from what the defendant reasonably believes to be the imminent use of unlawful force. A person is justified in using deadly force, and does not have a duty to retreat, only if he reasonably believes that deadly force is necessary to prevent serious bodily injury to himself or a third person. However, a person may not use force if he is committing a crime that is directly and immediately connected to the confrontation that leads to the use of force, he provokes a fight with another person with intent to cause bodily injury to that person, or he is [sic] willingly entered into a fight with another person or started the fight, unless he withdraws from the fight and communicates to the other person his intent to withdraw, and the other person nevertheless continues or threatens to continue to fight. The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. An individual has a right to act upon appearances of actual and immediate danger if he sincerely believes such apparent danger exists. It need only be apparent to a reasonable person under the circumstances.

*Tr.* at 831-32. The trial court provided its proposed final instructions, including the above regarding self-defense, to counsel to review, and neither party objected. *Id.* at 770. Cobb challenges the trial court's refusal to give three of his tendered instructions, and we address each in turn.

[25] Proposed Instruction No. 1 read as follows:

> A valid claim of self-defense provides a legal justification for a person to use force against another person to protect themselves from the imminent use of unlawful force. A claim of self defense requires that the person acted without fault, was in a place the person had a right to be, and was in reasonable fear of bodily harm. The force utilized must

be reasonable under the circumstances. *Milam v. State*, 719 N.E.2d 1208 (Ind. 1999).

*Appellant's App*. at 157. The State objected to Proposed Instruction No. 1, arguing that it was not a correct statement of the law and was covered by the trial court's final instruction on self-defense. Defense counsel replied that "reasonable fear of bodily harm" was at issue in the case, but it was not specifically included in the trial court's final instruction. *Tr*. at 771-72. The trial court rejected that argument, finding that the trial court's self-defense instruction recognized that a person "may use reasonable force from what he reasonably believes to be the imminent use of unlawful force" and that Cobb's Proposed Instruction No. 1 was adequately covered by the trial court's final instruction. *Id*. at 772.

[26] On appeal, Cobb appears to argue that the trial court's instruction "did not properly address required language as to self-defense," namely that a claim of self-defense requires that the defendant, among other things, be in a place that he or she had a right to be; Cobb argues that he was in a place that he had a right to be, at Smith's house, and that the trial court's final instruction did not address that aspect. *Appellant's Br*. at 15. Cobb did not raise this argument to the trial court, and, thus, he has waived it for appeal. *See Kane v. State*, 976 N.E.2d 1228, 1231 (Ind. 2012) (party wishing to preserve instructional error on appeal must identify specific grounds for objection at trial, citing Ind. Crim. Rule 8(B) and Ind. Trial Rule 51(C)). Waiver notwithstanding, Cobb has failed to explain how he was harmed by the exclusion of that language in the instruction or demonstrate that the alleged instructional error of failing to

include the challenged language prejudiced his substantial rights. We find no error with the trial court's rejection of Proposed Instruction No. 1.

[27] Proposed Instruction No. 2 stated as follows:

> Your decision as to whether the accused was acting in self-defense must be based on what the situation appeared to be to the accused rather than what the actual facts might have been. *Shaw v. State*, 534 N.E.2d 735 (Ind. 1989). *French v. State*, 403 N.E.2d 821 (Ind. 1980).

*Appellant's App.* at 158. The State objected to Proposed Instruction No. 2 and said, "I'm not even sure what that means." *Tr.* at 772-73. Defense counsel explained that the focus and purpose of the instruction was to instruct the jury about actual danger versus apparent danger from the defendant's perspective, and he argued that, during trial, Cobb presented testimony about his fear and belief of the danger and that the jury should determine whether his subjective belief was reasonable. The trial court determined that Cobb's Proposed Instruction No. 2 misstated the law because "self-defense is judged from . . . a reasonable person in the defendant's shoes," and that Proposed Instruction No. 2 focused only on what the situation appeared to be to be from the accused's perspective. *Id.* at 774. The trial court determined that Proposed Instruction No. 2 was misleading because it did not include the objective reasonable-person standard and would confuse the jury, and it declined the requested instruction.

[28] Similar to Proposed Instruction No. 2, Proposed Instruction No. 3 also addressed the concept of apparent versus actual danger. It read:

> With regard to the defense of self-defense, the existence of the danger, the necessity or apparent necessity of using force, as well as the

> amount of force required can only be determined form the standpoint of the accused at the time and under the then existing circumstances. A person's belief of apparent danger does not require the danger to be actual, but only that the belief be in good faith. *Shepard v. State*, 451 N.E. 2d 1118, 1120-1123 (Ind. Ct. App. 1983). *French v. State*, 403 N.E.2d 821, 825 (Ind. 1980). *Franklin v. State*, 364 N.E2d 1019, 1021 (Ind. 1977).

*Appellant's App*. at 159. The State objected on the same grounds as made in opposition to Proposed Instruction No. 2, that the instruction failed to address the objective standard of a reasonable person, and thus it misstated the law and was confusing. The trial court agreed and refused the instruction. However, although the trial court refused Proposed Instructions 2 and 3, it expressly acknowledged that the concept of apparent danger was not included in the trial court's final instruction and that Cobb had a right to an instruction on that aspect of self-defense. To this end, the trial court gave Cobb's Proposed Instruction No. 4, as modified by Cobb, and it read:

> An individual has a right to act upon appearances of actual and immediate danger if he sincerely believes such apparent danger exists. It need only be apparent to a reasonable person under the circumstances.

*Appellant's App*. at 160. On appeal, Cobb argues that the final instructions given to the jury "are void of the necessary language that the existence of the danger should be determined from the standpoint of the Defendant as opposed to only that of a reasonable person." *Appellant's Br*. at 19. We reject this claim. The instructions did not instruct the jury to only consider a reasonable person's viewpoint; the instructions stated that the defendant's personal belief was to be considered in its analysis. *Tr*. at 832 (person has right to act upon danger "if he

sincerely believes" such apparent danger exists). The instructions taken as a whole do not misstate the law or otherwise mislead the jury, and Cobb has failed to establish that his substantial rights were prejudiced by the manner in which the jury was instructed.

## III. Sufficiency of the Evidence

Cobb argues that the evidence was insufficient to convict him of robbery and murder, and he claims that the State failed to present sufficient evidence to rebut his claim of self-defense. Under Indiana Code section 35-41-3-2(a), a person is justified in using reasonable force against another person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. When a claim of self-defense is raised and is supported by evidence, the State has the burden of negating at least one of the necessary elements. *Pinkston v. State,* 821 N.E.2d 830, 842 (Ind. Ct. App. 2004), *trans. denied*. The State may satisfy its burden by either rebutting the defense directly or relying on the sufficiency of evidence in its case-in-chief. *Id.*

We review a challenge to the sufficiency of the evidence to rebut a claim of self-defense using the same standard as for any claim of insufficient evidence. *Id.* at 841. In reviewing a sufficiency of the evidence claim, we do not reweigh the evidence or judge the credibility of the witnesses. *Id.* If there exists sufficient evidence of probative evidence from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt, then we will not disturb the verdict. *Id.* at 841-42.

[31] As a threshold matter, we observe that our Supreme Court has held that if there is sufficient evidence that a defendant committed robbery, *i.e.* taking the property of another by force or threat of force, a claim of self-defense is not available as an affirmative defense to that crime of robbery. *See Rouster v. State,* 705 N.E.2d 999, 1006 (Ind. 1999) (defendant barred from asserting self-defense when jury found that he was engaged in robbery at the time of killings), *cert. denied*, 538 U.S. 1002 (2003); *Gage v. State*, 505 N.E.2d 430, 434 (Ind. 1987). That is, "[b]y its very nature, robbery is a crime that precludes the use of self-defense if the killing occurs during the commission of a robbery." *Henderson*, 795 N.E.2d at 481.

[32] To convict Cobb of Class B felony robbery as charged, the State was required to show that Cobb, while armed with a deadly weapon, namely a handgun, knowingly took Smith's safe by threatening the use of force. Ind. Code § 35-42-5-1(1); *Appellant's App*. at 155. Here, the evidence most favorable to the verdict is that Cobb came to Smith's residence, perhaps at Smith's invitation, and Cobb began accusing Smith of having raped a woman. Cobb continued arguing about it even after the woman told Cobb it did not happen and after Joshua told him to quit accusing Smith. Cobb held a knife to Smith's throat more than once. Then Cobb held Smith at gunpoint and ordered him to hurriedly open a safe, and when Smith failed to do so, Cobb shot him. There is no evidence that Smith was armed or resisting. After Cobb shot Smith in the back of the shoulder, Cobb shot Smith several more times and killed him. Cobb and his cousins gathered up Smith's guns, ammunition, knives, and the safe. Cobb

carried the safe from Smith's residence, placed it in the cab's trunk, and later pried it open with a crowbar and a hammer. We find that the State presented sufficient evidence to convict Cobb of robbery as charged. Accordingly, we reject his claim of self-defense and affirm his robbery conviction. *See Gage v. State*, 505 N.E.2d 430, 434 (Ind. 1987) (where jury's robbery conviction is supported by sufficient evidence, defendant's claim that State did not negate self-defense fails).

[33] Turning to Cobb's murder conviction, to convict Cobb of murder, the State was required to prove that Cobb knowingly or intentionally killed Smith. Ind. Code § 35-42-1-1(a); *Appellant's App*. at 155. At trial, Cobb claimed that the killing was in self-defense, and in order to establish this, Cobb was required to show that he: (1) was in a place where he had a right to be; (2) did not provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm. *Pinkston,* 821 N.E.2d at 842. Here, the State presented evidence that Jonathan and Joshua saw Cobb hold a knife to Smith's throat, and they testified that Cobb also held the knife to Joshua's throat and threatened to kill him and his family. They did not see Smith swing a knife at Cobb, as Cobb alleged. They saw Cobb follow Smith to his bedroom, and they saw him holding Smith down to the ground while pointing a handgun at his back, ordering Smith to hurry and open the safe. Jonathan saw Cobb shoot Smith in the back of the shoulder and saw Cobb fire more shots as Smith tried to stand up. Rather than immediately calling police, Cobb called Kelley and directed her to have a taxi sent for him and the other two men. When Cobb

and the other men left the scene, they took guns, ammunition, knives, and the safe. While at Kelley's residence, she and two of her friends stated that Cobb and Jonathan were laughing about having killed someone, and they also testified that the men were disappointed that the safe contained nothing of value. Cobb was heard saying that he "killed a man for nothing." *Tr.* at 462, 470, 472. Cobb and Jonathan worked on assembling a self-defense strategy, and Cobb even asked Jonathan to shoot him in order to make it appear as though Smith had injured him, but Jonathan refused. Cobb then cut and tore his shirt with a knife to make it appear Smith had done so. When the group left Kelley's residence, they left behind the shotgun, safe, and knives, which Kelley hid. When Cobb eventually called police, several hours later, he told the police that the shooting had just happened twenty to thirty minutes prior, and he failed to tell them that he went to Kelley's in Anderson. Jonathan testified that Smith never threatened Cobb, although he initially told the police otherwise pursuant to the group's self-defense story. Jonathan conceded that he told police "multiple stories." *Id.* at 353, 374. The jury heard Cobb's account describing how the night's events unfolded, and after hearing all of the evidence and observing the witnesses and judging their credibility, it rejected it. The State presented sufficient evidence from which the jury could find that Cobb provoked, and willingly participated, in the violence and that Cobb was not acting in fear of death or great bodily harm when he shot Smith multiple times, and it thereby rebutted Cobb's claim of self-defense.

While Cobb's brief generally asserted that the evidence was insufficient to support his robbery and murder convictions, *Appellant's Br.* at 1, 7, 19, he did not set forth any argument or support for the claim that the evidence did not support the murder conviction, other than his arguments that the State failed to negate his claim of self-defense. *Appellant's Br.* at 24-26. To that extent, he has waived his challenge to the sufficiency of the evidence as to his murder conviction. Ind. Appellate Rule 46(A)(8); *Pinkston*, 821 N.E.2d at 842. Waiver notwithstanding, we find that, given the record before us, the State presented sufficient evidence to convict Cobb of murder.

Affirmed.

Friedlander, J., and Crone, J., concur.